IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case No. 14-10105-2-JTM

WILLIAM MCGREEVY,

        Defendants.

**MEMORANDUM AND ORDER**

Defendant William McGreevy is charged with money laundering and conspiracy to launder money in connection with co-defendant William McManaman's narcotics distribution operation. Before the court are defendant's Motion for Severance of Defendants (Dkt. 23) and Motion to Suppress (Dkt. 24). The court addresses each in turn.

**I. Background**

On October 17, 2012, narcotics detectives Ben Blick and Jon Gil were monitoring William McManaman's home as part of an ongoing narcotics investigation. They observed defendant leaving McManaman's home and called Sedgwick County Sheriff Deputy Robert Lord, who was on patrol at the time. They asked Lord to follow defendant's vehicle and conduct a traffic stop if defendant violated any traffic laws. Lord followed defendant briefly and ran his license plate number; the search returned

as "tag not assigned" – a violation of K.S.A. § 8-142. Lord then stopped defendant for the violation.

Lord approached the driver's side window of defendant's vehicle to obtain license and registration information and noted an odor of alcohol emanating from defendant. Lord asked defendant whether he had been drinking; defendant acknowledged that he had consumed an alcoholic beverage recently. Lord returned to his patrol car to check defendant's name and description for outstanding warrants.

Lord returned to defendant's vehicle and asked him for proof of insurance or other identification bearing the vehicle identification number to aide the registration investigation. He also asked defendant to pull forward a small distance because their vehicles were obstructing the entrance to a neighborhood. Lord returned to his patrol car, and the two vehicles pulled forward a short distance. Before returning to defendant's vehicle, Lord called the narcotics detectives to inform them of defendant's identity. He also called for backup. Sedgwick County Sheriff K-9 officer Sergeant Henry Cocking was near and responded as backup.[1]

Lord then performed a field sobriety test and determined that defendant was likely not intoxicated. Lord returned to his patrol car to continue investigating the vehicle registration issue. Cocking arrived with the K-9 narcotics dog about two and a half minutes after Lord completed the field sobriety test. While Lord was searching the

---

[1] Cocking was in the area because of the nearby activities stemming from the narcotics investigation. Blick testified that Cocking frequently worked with the narcotics detectives and that it was common to request that he patrol nearby while narcotics investigations were active in the field.

state and county vehicle registration databases, Cocking ran the dog around defendant's pickup. The dog indicated narcotics on its first pass around defendant's vehicle. Cocking responded by searching defendant's vehicle, where he found a small amount of marijuana, a glass pipe, and an open container of alcohol.

Cocking informed Lord of the marijuana in defendant's vehicle. Lord then handcuffed defendant and placed him in the patrol car. Lord returned to defendant's vehicle to perform a more thorough search. While Lord was searching the vehicle, Cocking informed defendant that the narcotics detectives might let him go if he provided information about the McManaman drug operation.

Gil arrived at the scene soon thereafter, and defendant agreed to speak with him. Gil transported defendant to a different location for questioning that lasted approximately one hour. Defendant told Gil that he would cooperate in the McManaman investigation. Gil returned defendant to his vehicle after questioning, where he was released into his family's custody.

On or about November 2, 2012, Blick contacted defendant to set up an interview regarding the McManaman investigation. On November 7, 2012, defendant drove himself to the Sedgwick County Sheriff's Department for the interview. There, he told Blick that he had never received money from McManaman.

In the months following the November 7, 2012, interview, the McManaman investigation uncovered financial evidence indicating that defendant – contrary to his November statements to Blick – *had* received money from McManaman. Blick contacted defendant to set up a follow-up interview.

On August 7, 2013, defendant returned to the Sedgwick County Sheriff's Department for a second interview with Blick. Officer Goodwin, who conducted the financial investigation into McManaman in conjunction with the Internal Revenue Service, was also involved in the second interview. When confronted with the new financial evidence, defendant admitted receiving about $15,000 in cash from McManaman and returning the money without interest through a series of smaller check and cash payments.

During both interviews, Blick informed defendant that he was not the target of the investigation and that involved individuals who did not cooperate might be indicted.

Defendant was charged with one count of conspiracy to launder money on June 24, 2014. (Dkt. 1). A superseding indictment followed on April 28, 2015, charging defendant with five counts of money laundering and one count of conspiracy to launder money. (Dkt. 50).

## II. Legal Standard

The motion in limine provides a trial court the opportunity "to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *United States v. Cline*, 188 F. Supp. 2d 1287, 1291 (D. Kan. 2002) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). The power to make evidentiary rulings in limine is not expressly provided by statute or rule; it stems from the court's authority to administer and try cases. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see* FED. R. EVID. 103(d), 104(c), 402,

403, 611(a). Such rulings may increase judicial efficiency, but many evidentiary rulings "should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in the proper context." *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1208 (D. Kan. 2008) (citing *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975)).

### III. Analysis

**1. Defendant's motion for severance of co-defendant McManaman is moot.**

Defendant moves to sever his trial from that of co-defendant McManaman under Federal Rule of Criminal Procedure 14. However, defendant's motion became moot on March 12, 2015, when McManaman pled guilty. *See United States v. Hines*, 728 F.2d 421, 426 (10th Cir. 1984). Therefore, the motion is DENIED.

**2. Defendant's motion to suppress evidence from the traffic stop is denied.**

Defendant alleges that the traffic stop on October 17, 2012, violated the Fourth Amendment because he was stopped without probable cause or reasonable suspicion. Alternatively, he argues that the duration of the stop exceeded the scope of probable cause or reasonable suspicion that initially supported the stop. Defendant further argues that the drug dog sniff violated the Fourth Amendment because it was a warrantless search unsupported by reasonable suspicion or probable cause.

Evidence obtained in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures is subject to exclusion. *United States v. Maddox*, 388 F.3d 1356, 1361 (10th Cir. 2004); *accord* U.S. CONST. amend IV. The "fruit of the poisonous tree" doctrine further requires suppression of evidence indirectly obtained

through "exploitation of [the] illegality" of an unconstitutional search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

**A. The Initial Stop**

Fourth Amendment analyses of traffic stops are governed by the "reasonable suspicion" standards for investigative detentions expressed in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009). A traffic stop must be supported by a "particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The principles of *Terry* require a two-pronged analysis: (1) the stop must be "justified at its inception" and (2) the resulting detention must be "reasonably related in scope to the circumstances that justified the stop in the first place." *Winder*, 557 U.S. at 1133-34; *accord Terry*, 392 U.S. at 20. The stop must be objectively reasonable, considering the totality of the circumstances and information available to the officer; the officer's subjective motivations are irrelevant. *Winder*, 557 F.3d at 1134; *see also Whren v. United States*, 517 U.S. 806, 813 (1996).

"A traffic stop is justified at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion" that the motorist violated a "traffic or equipment regulation[] of the jurisdiction." *United States v. Martinez*, 512 F.3d 1268, 1272 (2008) (quotations and citations omitted).

The resulting detention must generally "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003). "During a routine traffic stop, an officer may request a driver's license and

vehicle registration, run a computer check of these documents, and issue a citation or warning." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). The driver must then be allowed to proceed without delay. *Id.* However, further detention is permissible if the officer develops "objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity." *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004). The scope of the detention must be objectively reasonable considering the totality of the circumstances. *Karam*, 496 F.3d at 1162. Reasonable suspicion for further detention must be based on more than a mere hunch, but need not rise to the level of probable cause. *Id.*

Here, defendant was stopped because Deputy Lord determined that his license plate violated Kansas vehicle registration laws. Thus, the stop was justified at its inception. Lord then observed an odor of alcohol on defendant, who admitted that he had been drinking. This information provided reasonable suspicion that defendant was driving while intoxicated or drinking while driving. Lord's reasonable suspicion of driving while intoxicated justified the field sobriety test and the time required to perform it. Lord then ran the vehicle registration, as is permitted during a routine traffic stop. Any extended time required to investigate the vehicle registration issue was warranted because Lord checked several databases in an effort to determine why defendant's license plate was "not assigned."

### B. The Drug Dog "Walk-Around"

"It is well settled that a drug dog's sniff outside of a car is not itself a search" under the Fourth Amendment and needs no probable cause justification. *United States v.*

7

*Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011) (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Thus, no warrant or warrant exception was required to walk the drug dog around defendant's car. Further, the drug dog sniff had no effect on the scope of the detention because it was performed during the registration check and did not extend the duration of the stop. The drug dog sniff did not violate the Fourth Amendment.

### C. The Automobile Search

A warrant is not required to search a vehicle if officers have probable cause to suspect the vehicle contains contraband. *Carroll v. United States*, 267 U.S. 132, 155-56 (1925) (establishing the so-called "automobile exception"); *United States v. Ross*, 456 U.S. 798, 799 (1982). Probable cause supports the search of any part of the vehicle where the suspected contraband may be located. *Ross*, 456 U.S. at 821-22. Probable cause for an automobile exception search exists when a drug dog "alerts to the odor of an illegal substance in the vehicle." *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009).

Here, the drug dog alerted to defendant's vehicle, providing probable cause that it contained contraband. That probable cause supported both a search of the vehicle anywhere contraband may be located and the extra detention time required to perform the search.

Therefore, the stop was justified from its inception until defendant's arrest and is not a Fourth Amendment violation.

**3. Defendant's statements given while under arrest on October 17, 2012, are suppressed.**

Defendant alleges that he was interrogated while under arrest without a *Miranda* warning or his waiver thereof. The government concedes that defendant was arrested when he was placed in handcuffs on the night of October 17, 2012, and that Lord, Cocking, and Gill questioned him without a *Miranda* waiver. The government likewise concedes that statements defendant made while in handcuffs on October 17, 2012, should be suppressed.

**4. Defendant's statements during police interviews on November 7, 2012, and August 7, 2013, are admissible.**

Defendant further argues that statements made at the November and August interviews at the police station are inadmissible because they were either (1) not given voluntarily or (2) fruit of the poisonous tree of an unlawful detention on the night of October 17, 2012.

    **A. Defendant voluntarily provided statements on November 7, 2012, and August 7, 2013.**

*Miranda* warnings and waivers are only required in custodial interrogations. *See United States v. Griffin*, 7 F.3d 1512, 1517-18 (10th Cir. 1993). Defendant concedes that he was not in custody during the interviews on November 7, 2012, and August 7, 2013. (Dkt. 69, at 4). Statements made during the interviews are therefore not suppressed under *Miranda*. However, defendant's statements must nevertheless be suppressed unless they were given voluntarily.

9

A defendant's statements to police are not admissible if they were obtained by compulsion within the meaning of the Fifth Amendment; they must be given voluntarily. *United States v. Cash*, 733 F.3d 1264, 1281 (10th Cir. 2013); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Bram v. United States*, 168 U.S. 532, 542-43 (1897); U.S CONST. amend. V. The government bears the burden of proving that defendant's incriminating statements were the product of a "free and unconstrained choice" and not of coercion brought about by governmental acts, threats, or promises that overbear the defendant's will in violation of the Fifth Amendment. *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). Inculpatory statements "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Brady v. United States*, 397 U.S. 742, 753 (1970) (quotation and citation omitted).

The voluntariness of incriminating statements is determined by the totality of the circumstances, "considering both the characteristics of the accused and the details of the interrogation." *Lopez*, 437 F.3d at 1063. Relevant factors of the characteristics of voluntariness include (1) the defendant's age, intelligence, and education; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment. *Id.*

Defendant is an adult displaying no indication of an intellectual functioning deficit. He was not detained, was advised that he was not under arrest, and was not subject to physical punishment. He was allowed to keep his cell phone and personal

10

effects. Defendant was allowed to make a work-related phone call during a break in the interview while the officers, who offered defendant coffee, left the room. The interviews were no longer than one hour and forty minutes in length and were separated by nine months' time. Defendant drove himself to and from the Sheriff's office for each interview. After the second interview, defendant voluntarily returned to the Sheriff's office to deliver certain financial records concerning the McManaman investigation. These factors do not indicate that defendant was coerced to provide incriminating statements during the interviews.

Defendant argues that officers "hung" the threat of prosecution over his head to compel his statements. However, officers' references to possible prosecutorial consequences of defendant's actions are not instances of the "improper influence" referenced in *Brady*, 397 U.S. at 753. Rather, they are truthful indicators of the possible consequences of defendant's actions. Officers' suggestion of possible prosecution for defendant's drug activities was neither false nor improper.

### 1. Officers did not make coercive promises of leniency.

Defendant also argues that he was coerced by promises of leniency. In the Tenth Circuit, a promise to make a defendant's cooperation known to the prosecutor does not produce a coerced statement. *Id.* at 1064. A high degree of specific detail in a purported promise of leniency, such as identifying former cooperators' specific leniency or the quantity of leniency a defendant will receive, may render a statement coerced. *Id.* Limited assurances do not render ensuing statements involuntary. *United States v. Lewis*,

24 F.3d 79, 82 (10th Cir. 1994) (citing *United States v. Fountain*, 776 F.2d 878, 885 (10th Cir. 1985)).

Here, officers told defendant a number of times that he should decide whether he wanted to be among the non-cooperators who may be indicted and go to jail or among the cooperators who stay out of jail. They told defendant that he was not the target of the investigation. They did not tell defendant how many years he could spend in prison if he did not cooperate, nor did they discuss sentences or leniency of specific other similarly situated individuals. The officers also clarified that they did not have the authority to grant leniency, but that they would make his cooperation known to the prosecutor who held such authority.

In *Fountain*, the defendant alleged that implied promises of immunity from an officer coerced his statement. 776 F.2d at 885. The court found that, in each communication in question, the defendant had initiated contact, that the officer pointedly and specifically advised that immunity could only be granted by the prosecuting authority and not by the officer, and that no evidence indicated that the prosecutor was aware of any such promise of leniency. *Id.* The court found that the defendant's statements were not the result of an impermissible promise of leniency. *Id.* at 885-86.

Similarly, defendant here initiated each encounter by driving himself to the police station, officers did not make any express promises of leniency, and defendant was specifically advised that determinations of leniency rest with the prosecutor. Defendant was given only a limited assurance of leniency for cooperation.

The totality of the circumstances indicates that defendant's decision to participate in the interviews, and the information provided therein, was not coerced.

**B. Fruit of the Poisonous Tree**

Defendant further argues that statements given at the November 2012 and August 2013 interviews should be suppressed as fruit of the poisonous tree in connection with the events of October 17, 2012. As explained above, the traffic stop did not violate the Fourth Amendment; the interviews therefore cannot be suppressed as the fruit of that tree. The remaining issue is whether the interviews should be suppressed as the fruit of impermissible questioning while defendant was in custody on October 17, 2012.

Evidence obtained by exploiting a primary illegality is inadmissible. *Wong Sun*, 371 U.S. at 488 (the "fruit of the poisonous tree" doctrine). However, evidence is not fruit of the poisonous tree if it is obtained by "means sufficiently distinguishable [from the primary illegality] to be purged of the primary taint." *Id.* The passage of time can wash away any taint of a *Miranda* violation if the circumstances render the original illegality attenuated or diminished. *United States v. Bautista*, 145 F.3d 1140, 1150 (10th Cir. 1998) (passage of six days between *Miranda* violation and defendant's confession was "a sufficient intervening circumstance to wash away any taint") (citing *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996)).

Here, defendant was first interviewed several weeks after officers violated his *Miranda* rights; the second interview was nearly ten months after the *Miranda* violation. This substantial passage of time out of police custody significantly reduces the taint of

13

the violation. Further, the primary illegality occurred when defendant was arrested, transported, and questioned while in custody, which is quite distinguishable from interviews where he voluntarily transported himself to the concededly noncustodial sessions where he spoke freely with officers about McManaman.

Moreover, the officers who violated defendant's *Miranda* rights were not present during either interview. The fact that the officers who interviewed defendant had not previously violated his rights creates further discontinuity between the illegal questioning and the interviews. *See Bautista*, 145 F.3d at 1150.

The information provided during the November 2012 and August 2013 interviews is sufficiently distinct and attenuated from the *Miranda* violation on October 17, 2012, to wash away the taint of that violation.

Defendant's Motion to Suppress (Dkt. 24) is DENIED.

IT IS ACCORDINGLY ORDERED this 14th day of August, 2015, that defendant's motions (Dkts. 23, 24) are DENIED.

 s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE